UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN ERIC BENNETT                    Case No. 17-12249

          Plaintiff,                 Matthew F. Leitman
v.                                   United States District Judge

OBELL T. WINN, *et al*.,               Michael J. Hluchaniuk
                                     United State Magistrate Judge
          Defendants.
_____/

**REPORT AND RECOMMENDATION**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 36)**

## I.   PROCEDURAL HISTORY

Plaintiff John Eric Bennett filed this prisoner civil rights action on July 10,

2017 against defendant employees of the Michigan Department of Corrections

(MDOC).  (ECF No. 1).  He alleges violations of the First and Eighth Amendments

to the United States Constitution and for gross negligence under Michigan law.

Remaining defendants Deshias, Florey, McLean, Winn, and Wright filed a motion

for summary judgment on all the remaining claims.  (ECF No. 36).  After plaintiff

was granted a series of extensions, he responded to the motion on January 29,

2020.  (ECF No. 65).  Defendants did not file a reply brief.  This matter was

referred to the undersigned for all pretrial matters on November 7, 2019. (ECF No. 57).

## II.    FACTUAL BACKGROUND

The events giving rise to the claims in this case occurred while plaintiff was incarcerated at Saginaw Correctional Facility (SRF); the defendants were employed at SRF as administrators and corrections officers. (ECF No. 65, PageID.1265, ¶ 2). On December 12, 2013, plaintiff was physically assaulted by his cellmate, inmate Meredith.[1] (*Id.* at PageID.1266, ¶ 8). Later that day, plaintiff was transferred to the "#600" unit at SRF. (*Id.* at ¶ 9). His new cellmate, Christopher Beal, explained to plaintiff that there was gang activity in the #600 unit and that he was a member of "The Bloods" gang. (*Id.* at Page.ID.1267, ¶ 13). On January 3, 2014, upon returning to his cell, Beal asked plaintiff if he knew Meredith, his former cellmate. (*Id.* at PageID.1268, ¶ 15). Beal also said, "I heard you got a Cho-MO (Child Molestation) case? . . . You can't stay in this room homie . . . you gotta go!" (*Id.* at ¶ 16). Plaintiff tried to explain to Beal that he did not have a child molestation case, but Beal would not hear it and repeated that plaintiff had to go. Beal further explained that his last cellmate, or "bunky," had a criminal sexual conduct case, so The Bloods made him move out or "stay and get stabbed." (*Id.*).

---

[1] Plaintiff's claims regarding the attack by Meredith were previously dismissed. (ECF No. 31).

On January 10, 2014, while walking back to his unit from the chow hall,[2] his cellmate Beal and his fellow gang members slowed down their pace.  Plaintiff caught up to them.  Beal then launched towards him from a group of "Bloods" gang members and stabbed him twice with a shank—once in the neck and once in his upper right arm.  (*Id.* at PageID.1270, ¶24).  The assault took place in an "L-shaped" walkway that connects the #600 unit to the chow hall.  Bennett says this walkway is known for "pervasive acts of gang-relative [sic] violence against unsuspected SRF inmates housed in HU #600."  (*Id.*).  Bennett was sent to the hospital after the attack.  This attack is the basis for plaintiff's Eighth Amendment and gross negligence claims.

A.      January 10, 2014 Assault on Plaintiff – Defendants McLean and Winn

Plaintiff's Eighth Amendment claim is about what happened, or did not happen, prior to this attack.  Bennett says that he informed defendants McLean and Winn of the threats to his safety from Beal, but they did not act.  The officials, on

---

[2] In his verified complaint, he says he was attacked while he was walking to the chow hall.  (ECF No. 1, PageID.21-22).  In his response to the motion for summary judgment, and supporting affidavit, he says the attack took place as the prisoners were leaving the chow hall and going back to the unit.  (ECF No. 65, PageID.1270, ¶ 24).  The critical incident reports indicate that the assault took place as the prisoners were leaving chow hall for their unit.  (*See, e.g.*, ECF No. 65, PageID.1362).  Further, defendants acknowledge that the assault took place on the way back from chow hall.

the other hand, say that Bennett did not reach out to them, that they did not know of any threat to his safety.

B.     January 10, 2014 Assault of Plaintiff – Defendants Wright and Florey

Defendants Wright and Florey did not bring forth evidence to dispute plaintiff's allegations.  As stated above, the assault took place in the L-shaped walkway on the way back from the chow hall.  Bennett says it is common knowledge that gang-related attacks and stabbings occur frequently in this walkway "because this walkway is located in an isolated area of the prison that is rarely supervised by corrections officers during mass movement."  During his attack, there were no corrections officers standing "on post" in front of his unit or in the corner of the L-shaped walkway.  (*Id.* at PageID.1282-83, ¶69-70).

Bennett asserts that Florey and Wright abandoned their posts in or near the walkway in deliberate indifference to inmate safety.  The implication is that, had they been standing where they regularly stood during inmate movement, the attack would not have happened.

C.     Retaliation – Defendant McLean

According to Bennett, McLean retaliated against him for going to defendant Winn after talking to McLean because McLean had not taken any action.  Bennett says McLean threatened to transfer him to a prison far away from his family, and

that McLean initiated the transfer process. Bennett was moved shortly thereafter to another prison.

### D. Retaliation – Defendants Winn and Deshias

The retaliation claim against defendants Winn and Deshias is about contraband Deshias claims to have found in Bennett's cell. Bennett believes that Winn overheard a message he left for his attorney that he planned to file a lawsuit about the failure to protect him from Beal. He says that Winn and Deshias then planned to plant contraband in his cell in retaliation for talking to a lawyer about filing a lawsuit.

Winn does not recall having a conversation with Bennett about Officer McLean. He does not recall having a conversation with Bennett where he accused Dehias, McLean, and him of conspiring to plant weapons and contraband in Bennett's cell. (ECF No. 37-3, PageID.536, ¶ 7). He says he has never conspired to have a weapon or other contraband planted on a prisoner or in a prisoner's cell.

## III. ANALYSIS AND RECOMMENDATIONS

### A. Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion

by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'"  *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).

In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also

for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

    B.    <u>Discussion</u>

        1.    8th Amendment Failure to Protect

A "failure to protect" claim is analyzed under the Eighth Amendment deliberate indifference to safety standard. *See e.g., Bishop v. Hackel*, 636 F.3d 757 (6th Cir. 2011). Under that standard, a prison inmate first must show that the failure to protect from risk of harm is objectively "sufficiently serious." *Id*. at 766 (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). That is, the inmate must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id*. Next, the inmate must show that the prison official was deliberately indifferent—that is, that the prison official knew of and disregarded an excessive risk to the inmate's health or safety; the official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and he must actually "draw the inference." *Id*. (quoting *Farmer v. Brennan*, 511 U.S. at 837).

The Supreme Court has determined that any given prisoner is not entitled to a "comfortable" prison but is entitled to a "humane" one. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Thus, the treatment a prisoner receives in prison is subject

to the limits of the Eighth Amendment. *Id*. Those limits require that prison officials take "reasonable measures" to provide for the safety of the prisoners. *Id*. Included in such "reasonable measures" is the duty to "protect prisoners from violence at the hands of other prisoners." *Id*. at 833. The Eighth Amendment line is breached when (1) a prisoner is incarcerated under circumstances that pose a substantial risk of serious harm and (2) prison officials proceed with deliberate indifference to the safety of the prisoner. *Id*. at 834. On the continuum of conduct, deliberate indifference is something greater than mere negligence and less than purposeful or knowing conduct—it is the "equivalent of recklessly disregarding" a serious risk of harm to the prisoner. *Id*. at 836. The test is a subjective one which requires proof that the prison official "acted or failed to act despite [his or her] knowledge of a substantial risk of serious harm." *Id*. at 842. "To demonstrate deliberate indifference, an inmate must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregarded the risk by failing to take reasonable measures to abate it.'" *Sigers v. Bailey*, 2009 WL 2872811, at *3-4 (E.D. Mich. July 30, 2009), *report and recommendation adopted*, 2009 WL 2872814 (E.D. Mich. Sept. 1, 2009); (citing *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 829)); *see also August v. Ratliff*, 2017 WL 461291 (E.D. Mich. Feb. 3, 2017) (collecting cases). "Whether a prison official had the requisite knowledge of a

9

substantial risk is a question of fact subject to demonstration in the usual ways,
including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.
However, a prison official who was unaware of a substantial risk of harm to an
inmate may not be held liable under the Eighth Amendment even if the risk was
obvious and a reasonable prison official would have noticed it. *See id.* at 841–42.

The defendants do not argue that the objective component is not met in this
case.

a.   Subjective Component – Defendant McLean

There is a question of material fact on the subjective component as to
defendant McLean.  According to plaintiff's sworn declaration, he was living with
a cell mate who wanted him out of the cell because he thought plaintiff was a
snitch and a child molester—dangerous labels to have in prison.  Plaintiff says he
both spoke to McLean in person about his issues with Beal and wrote him a letter
about it.  (ECF No. 65, PageID.1358; (*Id.* at PageID.1270, ¶ 20).  In the letter,
Bennett wrote:

> I am writing the letter concerning a serious situation
> regard [sic] my bunky (Christopher Beal).  He and I are
> not getting along very well.  I believe he is aware of the
> fight I had with inmate Meredith . . . because he brought
> it up several times, including that I have a "child
> molestation" case, which I don't.  He has also accused
> me of "snitching" on inmate Meredith.  I don't feel safe,
> because I believe my life is in danger.  Inmate Beal
> expressed to me that he was a gang-member with 'The

10

> Bloods' and that he don't want me locking in the cell
> with him.

(ECF No. 65, PageID.1358).  Bennett asked to be moved out of the cell or placed in protective custody.  He was afraid of what could happen to him if he stayed in the cell.  (ECF No. 65, PageID.1358).

Later that day, January 6, 2014, he put this letter under McLean's office door, and then spoke to McLean.  McLean said he got the kite and asked what was going on.  (ECF No. 65, PageID.1270, ¶ 20).  He told Bennett that they did not move a prisoner just because he asked to move; there is an investigation protocol and a determination has to be made.  (*Id.* at ¶ 22).  He suggested trying to reconcile with Beal.

McLean disputes that he ever received a kite from Bennett about his concerns for his safety, and that the two ever talked in person about it. Specifically, McLean avers that he does not recall receiving a kite from Bennett stating that he was in fear of his life.  If he had received such a kite, his standard practice would have been to call the prisoner into his office to find out the circumstances.  He then would have completed a protection request for the "SCC" team to review.  If a prisoner stated he was in fear of his cell mate, McLean says he would have moved the prisoner to another cell or to another unit.  (ECF No. 37-2, McLean Affidavit, ¶ 4-5).

Taking all reasonable inferences in the light most favorable to Bennett, Bennett has raised a material question of fact as to whether McLean had knowledge of facts from which to infer that there was a serious risk of harm to plaintiff, and did in fact draw that inference. In Bennett's letter to Mclean, he pointed out the specific inmate he feared, that the inmate was a gang member, and Beal did not want Bennett in the cell with him. Bennett also said that Beal thought he was a snitch and a child molester—labels that are dangerous in the prison setting.[3]

The facts of this case are similar to the circumstances before the Court in *Scarber v. Fisher*, 2012 WL 553900 (E.D. Mich. Jan. 27, 2012), *report and recommendation adopted*, 2012 WL 554337 (E.D. Mich. Feb. 21, 2012). In that case, the plaintiff prisoner worked a job cleaning cells. Defendant Fisher, a Resident Unit Officer, opened a cell door when the inhabitant pushed the emergency button. *Id.* at, *1. Nothing happened to Scarber in that instance, but he told Fisher and other prison officials that letting an inmate out of their cell while he was working in the unit put his safety at risk since he was being threatened by another inmate in that unit. The other prison officials ignored him, and Fisher, on

---

[3] Though it seems this may be common knowledge, the undersigned is also guided by the principle that all reasonable inferences are to be drawn in plaintiff's favor in this matter. It is reasonable to infer that other prisoners do not take kindly to an inmate labeled as a snitch and a child molester.

another occasion, let out an inmate who pushed the emergency button while
Scarber worked in the area.  That inmate attacked Scarber with a weapon.  *Id.* at,
*1-2.  Fisher contended that plaintiff never told her he was being threatened by
another prisoner or that he needed protection.  *Id.* at, *4.  Scarber swore otherwise.
The Court concluded that plaintiff raised a question of fact as to whether Fisher
was aware of facts from which to infer a serious risk to Scarber, and whether she in
fact drew the inference.  *Id.*

Aside from differences in the minutiae of the facts, there is no material
difference between *Scarber* and this case.  McLean claims plaintiff never told him
of any threats from Beal, while plaintiff says he told McLean, in person and in
writing, of the situation with Beal—that Beal was a gang member who thought
plaintiff was a snitch and a child molester, and Beal wanted plaintiff out of their
cell—and asked to be moved or placed in protective custody.  McLean did not act
to move plaintiff.  At this stage, the Court does not make credibility determinations
and decide whose story to believe.  *Shreve v. Jessamine County Fiscal Court*, 453
F.3d 681, 688 (6th Cir. 2006) ("In determining whether to grant summary
judgment, a court may not make determinations of witness credibility.").  A
reasonable jury could conclude that Bennett wrote and spoke to McLean about the
issues and that the letter and the conversation put McLean on notice that there was
a serious risk of harm to plaintiff, but that McLean disregarded the risk.

Like the defendant in *Scarber*, McLean argues that he cannot be liable for the attack on Bennett because it was an isolated incident.  McLean cites *Stewart v. Love*, 696 F.2d 43 (6th Cir. 1982) in support.  The *Stewart* court did indeed hold that "generally an isolated or occasional attack is not sufficient to state a claim" for deliberate indifference.  But, the facts were different from this case.  In *Stewart*, the prisoner advised prison officials about rumors of an impending assault against him. The prison addressed the prisoner's concern by transferring him to another unit for six months.  *Id.* at 44.  When he returned to his original cell he reported "only the most general allegations that 'someone was going to get hit on the head,'" fears based on what he heard through the "rumor mill."  But he was not moved a second time.  He was then assaulted. *Id.* at 45.  The court concluded that this second attack was an isolated incident.

Although the Sixth Circuit upheld the district court's determination that the prison officials did not violate the prisoner's Eighth Amendment rights under the facts of that case, it made clear that deliberate indifference could not be shown because the officers had taken at least some action in response to the prisoner's concerns:

> Of course, the allegation that the plaintiff had informed the prison officials of an alleged plot to injure him does raise somewhat thorny questions. Had no action whatsoever been taken to protect the plaintiff, the court would be inclined to allow this action to proceed to a full hearing.

14

*Id.*

There are other cases similar to the case at hand, as pointed out in *Scarber*. In *Randolph v. Decker*, 2006 WL 3613204 (W.D. Mich. Dec.11, 2006), the plaintiff, Randolph, was placed in a cell with two older men. He knew that the two inmates had a reputation for violence against other prisoners. The two men were hostile towards Randolph and gave him an "ultimatum" to seek a cell change. *Id.* at *1. Randolph told the defendant corrections officer about the ultimatum. The defendant informed Randolph that the cell mates had already talked to him about moving Randolph; he was not moved. He was stabbed in the ear three days later. Randolph and the defendant presented competing evidence with regard to whether Randolph informed the defendant that he was in fear for his life or safety as a result of the ultimatum. *Id.* at *3. In light of this dispute, the court concluded that there was a genuine issue of material fact as to whether the defendant "was deliberately indifferent to the possibility that Plaintiff would be assaulted."

In *Mills v. Lafler*, 2008 WL 4386750 (E.D. Mich. Sept. 25, 2008), the plaintiff alleged that he told his unit supervisor, Fields, about threats of harm from his cell mate, who wanted Mills to move to a different cell. *Id.* at *2. Fields did not move Mills, despite an assault that occurred between conversations with Fields on different days about the threats. Mills was later seriously injured in an attack by his cell mate. *Id.* Fields disputed that Mills told her about threats of harm, but Mills swore that he told her and other officials of the threats. *Id.* at *8, n.6. The

court rejected defendant's "isolated incident" argument, instead finding a question of fact about what warning Mills gave the corrections officer.  *Id.* at *11.

The facts in this case are similar to the cases just discussed.  Bennett avers that he told McLean that his cell mate, Beal, said he was a member of a gang, he called Bennett a snitch and a child molester, that Beal threatened him to move out of their cell, and that he was in fear for his life.  McLean did not take any action, though he disputes that he was ever aware of any threat of harm to Bennett.  Taken in the light most favorable to plaintiff, those allegations raise a question of material fact about whether McLean "had actual knowledge of facts from which the inference could be drawn that a substantial risk of serious harm existed" and "actually drew the inference" that there was a substantial risk of harm to plaintiff.

b.      Subjective Component – Defendant Winn

The facts alleged against defendant Deputy Warden Winn are not very different from the facts alleged against defendant McLean.  On January 6, 2014, Bennett placed a letter to Winn in the prison mailbox.  He attached a copy of this letter to his response brief.  Bennett wrote the following:

> I am writing this kite in regards to a serious situation that has develop[ed] between my bunky (inmate Beal) and I. On 12/12/13, I was moved to HU #600 from HU #1200, after a physical confrontation with my former bunky (Mr. Meredith).  Since being in the cell, inmate Beal found out that I have a CSC [criminal sexual conduct] case, which I believe he was told by Meredith.  Beal accused me of being a "child molester" and snitching on Meredith.  He

> said I got to move out the cell, or face the consequence.
> He believe [sic] Beal belong to a gang called the
> "Bloods."  I fear my life is in danger, therefore can you
> <u>please</u> make an emergency cell change or place me in
> P.C.?

(ECF No. 65, PageID.1406) (emphasis in original).

Bennett further informed Winn that McLean was aware of the "situation,"
but McLean was deliberately refusing to do anything.  According to Bennett, on
February 6th, after the attack while he was housed in segregation, he spoke
personally to Winn.  Winn acknowledged receiving the kite from Bennett and told
Bennett that he had told McLean to look into the issue at that time.  (*Id.* at
PageID.1280, ¶ 62).

In his affidavit, Winn, like McLean, says he does not recall receiving any
kites from Bennett stating he was in fear for his life or talking to Bennett in the
segregation unit.  If he had, he would have initiated an investigation into the threat.
(ECF No. 37-3, PageID.536, ¶ 4).  He also says that, as deputy warden, he did not
arrange for cell changes; cell changes were handled by housing staff.  (ECF No.
37-3, PageID.536, ¶ 4, 5, 7).

Like with McLean, these competing sworn statements create an issue of
material fact as to whether Winn was aware of facts from which to infer, and did in
fact infer, a substantial risk of harm to plaintiff, but disregarded the risk.  Even if
Winn, as deputy warden, did not arrange for cell changes, a reasonable jury could

conclude that, as deputy warden, he had the authority to take some kind of action to move Bennett, but deliberately declined to do so.

The defendants argue that changing Bennett's cell would not have prevented the attack since the attack took place outside the cell. This argument misses plaintiff's point. Plaintiff told the defendants that Beal wanted him out of their cell. It is reasonable to infer, based on the facts presented here, that Beal would become increasable angry if plaintiff remained in the cell. On the other hand, it appears that Beal would have been satisfied if plaintiff had been moved. If he was moved, there is no indication that the attack would have happened. Further, defendants cite no support for the assertion that the attack must take place in the cell under these circumstances in order for their inaction to be considered a constitutional violation.

c.    Subjective Component – Defendants Florey and Wright

The underlying facts of plaintiff's failure to protect claim against defendants Florey and Wright begin and end in the L-shaped walkway between his unit and the chow hall, where the attack took place. Bennett says it is common knowledge among corrections officers and inmates that gang-related attacks and stabbings occur frequently in this walkway "because this walkway is located in an isolated area of the prison that is rarely supervised by corrections officers during mass movement." During his attack, he says there were no corrections officers standing

"on post" in front of his unit or in the corner of the L-shaped walkway.  (ECF No. 65, PageID.1282-83, ¶69-70).

Just before the attack, he saw defendant Florey, who he says was regularly assigned to the walkway during mass movement, talking to corrections officers outside the chow hall.  (*Id.* at PageID.1283, ¶ 71).  He also saw defendant Wright, who he says was regularly assigned to the #600 unit during mass movement, talking with another officer about 50 yards from the unit entrance door.  (*Id.* at ¶ 72).   Neither defendant was watching the walkway.

Plaintiff does not claim that Florey and Wright were aware of the specific threats from Beal.  Florey and Wright do not dispute the critical facts alleged against them—that they were aware that the walkway was known for violent attacks, that they were regularly assigned to the walkway during prisoner movement, and that they abandoned their posts the night plaintiff was attacked.

Showing that a defendant was aware of a risk of harm specific to the plaintiff is not the only means of demonstrating subjective knowledge of a risk. The Supreme Court held that "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer,* 511 U.S. at 842.  The Court noted,

> For example, if an Eighth Amendment plaintiff presents
> evidence showing that a substantial risk of inmate attacks

> was longstanding, pervasive, well-documented, or
> expressly noted by prison officials in the past, and the
> circumstances suggest that the defendant-official being
> sued had been exposed to information concerning the risk
> and thus must have known about it, then such evidence
> could be sufficient to permit a trier of fact to find that the
> defendant-official had actual knowledge of the risk.

*Id.* at 842-43 (internal quotations omitted).  In these cases, "it does not matter ...

whether a prisoner faces an excessive risk of attack for reasons personal to him or

because all prisoners in his situation face such a risk."  *Id.* at 843; *Greene v.*

*Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) ("[A]wareness can be demonstrated

through 'inference from circumstantial evidence,' and a prison official cannot

'escape liability ... by showing that, while he was aware of an obvious, substantial

risk to inmate safety, he did not know that the complainant was especially likely to

be assaulted by the specific prisoner who eventually committed the assault.'")

(quoting *Farmer*, 511 U.S. at 842-43).  In short, the Supreme Court has expressly

rejected the contention that the plaintiff must have alerted the defendant of the

specific danger he faced.

Bennett has presented some evidence—by way of his declaration—that it

was common knowledge among officers and inmates that there were "frequent"

violent attacks in that L-shaped walkway because it was rarely supervised. It is

reasonable to infer that, if it was common knowledge that attacks occurred

frequently in the walkway, that Florey and Wright—who were officers regularly

assigned to the walkway and the entrance—"had been exposed to information

concerning the risk," *Farmer*, 511 U.S. at 842-43, because the risk of attack was

obvious. *See Shultz v. Dart*, 2016 WL 212930, at *2 (N.D. Ill. Jan. 19, 2016)

("Although Shultz's testimony explicitly indicates only his own awareness that

inmates scheduled for release face that particular danger, it is a reasonable

inference that this was common knowledge among inmates and custodial staff,"

and thus "a reasonable jury [could] find that the risk was so obvious that [the

defendant] must have been aware of it").

But whether they were deliberately indifferent by not standing where

plaintiff says they regularly were assigned is another matter. If they abandoned

their posts, a jury could conclude, based on their knowledge of the risk of attack,

that they were deliberately indifferent. But if they were not assigned to that post,

then they could not have been deliberately indifferent to inmate risk by not being

there.

The Sixth Circuit, albeit in the context of a motion to dismiss, found that

allegations similar to Bennett's in this case stated an Eighth Amendment violation.

In *Jones v. Leiter*, 2016 U.S. App. LEXIS 24198 (6th Cir. Sept. 13, 2016), the

plaintiff alleged that he was assaulted by another prisoner in the dining area of the

prison. He claimed that the assault would not have occurred had the defendant,

Leiter, not left the dining area unsupervised for fifteen to twenty minutes. He

further alleged that Leiter was in violation of prison policy by leaving and that Leiter and the other defendants were aware that assaults in the kitchen area were common. *Id.* at *2-3). Because the plaintiff alleged that Leiter was aware that assaults in the kitchen were common and nonetheless left plaintiff and the inmates unattended, the allegations "could show that Leiter was deliberately indifferent to a substantial risk of serious harm" to the plaintiff. *Id.* at *4.

In another case, *Presley v. Jones*, 2019 WL 5654356 (W.D. Tenn. Oct. 31, 2019), the plaintiff alleged that one of the defendants, defendant Moore, was aware that the fourth floor of the prison had three riots in 90 days and that rival gangs were being housed together on that floor. Still, Moore did not separate the rival gangs or lock down the fourth floor. Plaintiff was injured in another riot. The court concluded that the allegations suggested that Moore was aware of a substantial risk of an inmate attack that was longstanding or pervasive and that he deliberately disregarded the risk. *Id.* at *3.

Here, on summary judgment, plaintiff has presented unrebutted evidence that it was common knowledge among corrections officers that inmate attacks in the walkway happened frequently because it was rarely supervised, and that Florey and Wright were regularly assigned to the walkway. It is reasonable to infer that Florey and Wright were thus aware of the frequency of attacks but disregarded the risk by not standing at their posts. It is not as if plaintiff brings only the conclusory

allegation that inmate attacks happen in prisons, and thus leaving their posts was deliberate indifference. *See, e.g.*, *Presley*, 2019 WL 5654356, at *3 (No Eighth Amendment claim where plaintiff did not allege that other defendant was aware of "long-simmering tension" on the floor or that by not calling backup a riot would ensue); *Ribble v. Lucky*, 817 F. Supp. 653 (E.D. Mich. 1993) (No deliberate indifference where the plaintiff argued that defendant's knowledge of a risk of harm could be inferred because prison life, in general, is violent). Plaintiff has come forward with specific affidavit statements that would allow a reasonable jury to conclude that Florey and Wright were deliberately indifferent to inmate safety the day plaintiff was attacked.

It appears, though, that there was a corrections officer in the walkway at the time the assault took place. Corrections officer Sanders, in his critical incident report, stated that while watching the crowd from the 600 unit come back from the chow hall on the walkway, he heard a loud thump and heard or saw one person fall into the snow while holding another inmate. When he got through the crowd to the altercation, he cleared the area and saw that Bennett was bleeding. Sanders made the call that there was a fight; Wright and Florey responded and escorted Bennett to healthcare. (ECF No. 37-4, PageID.548). Bennett says Wright responded to the scene 30 seconds after the assault. (ECF No. 65, PageID.1284, ¶ 74). Bennett neither mentions Sanders nor disputes his statement in the incident report. Bennett

is in possession of his statement, as he attached it to his response brief as an exhibit, so he is aware of it.  (*See* ECF No. 65, PageID.1362).

However, even though Sanders states he was in the walkway and heard a thud, it is not clear that this would absolve Florey and Wright of liability if they were also supposed to be there.  If they were there, it is conceivable that the attack might not have happened.

In the view of the undersigned, defendants Florey and Wright are not entitled to summary judgment on the Eighth Amendment claim.

### 2.  Michigan Gross Negligence

Plaintiff also brought a gross negligence claim under Michigan law against defendants Winn, McLean, Florey, and Wright based on the same conduct that forms the failure to protect claims against these defendants.  (ECF No. 1, Count Three).  An officer acting, or who reasonably believes that he is acting, within the scope of his authority while engaged in the exercise or discharge of a governmental function is immune from the imposition of tort liability so long as his conduct does not amount to gross negligence that is the proximate cause of the injury or damage.  M.C.L. § 691.1407(2).  Gross negligence is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  M.C.L.§ 691.1407(2)(c). To hold officers liable, "their gross negligence must be the one most immediate, efficient, and direct cause of the injury or damage, i.e. the

proximate cause." *Kruger v. White Lake Twp.,* 250 Mich. App. 622, 648 N.W.2d 660 (2002) (quoting *Robinson v. Detroit,* 462 Mich. 439, 613 N.W.2d 307 (2000) (quotation marks omitted).

Defendants and plaintiff agree that the defendants were acting within the scope of their employment with the Michigan Department of Corrections at the time of plaintiff's attack. However, defendants argue that their conduct, or lack of action, was not the proximate cause of plaintiff's injury, as that term is used in the context of a gross negligence claim.[4] Rather, the proximate cause was inmate Beal stabbing plaintiff.

The Michigan Supreme Court has held that the phrase, "*the* proximate cause" in M.C.L. § 691.1407 does not mean "*a* proximate cause," as is usually the case in tort law, but rather "the one most immediate, efficient, and direct cause of the injury or damage." *Robinson v. City of Detroit,* 462 Mich. 439, 613 N.W.2d 307, 319 (2000) (emphasis added). In *Robinson*, the plaintiffs were innocent passengers injured in a car driven by an underage driver who was fleeing police officers. Applying the gross negligence proximate cause standard, the court held

---

[4] Since the defendants do not also argue that their conduct was not grossly negligent, the undersigned will not address the issue. The following analysis regarding proximate cause assumes, but does not decide, gross negligence. The undersigned notes, however, that deliberate indifference is a more stringent standard than gross negligence, and there is a question of material fact on the question of deliberate indifference.

that it was the conduct of the reckless driver, not the conduct of the pursuing police officers, that was the proximate cause of the plaintiffs' injuries. *Id.* at 462.

In 2017, the Michigan Supreme Court revisited the analysis of proximate cause in a gross negligence claim and announced a new framework. *See Ray v. Swager (On Remand)*, 321 Mich. App. 755, 758 (2017) (*Ray II*) (citing *Ray v. Swager*, 501 Mich. 52 (2017) (*Ray I*)).  Defendants do not address this framework. As the court explained in *Ray II*,

> The analysis under this framework begins with determining whether the defendant's gross negligence was a cause in fact of the plaintiff's injuries. Provided that a defendant's gross negligence was a factual cause, the court must then consider whether the defendant was a proximate—i.e. legal—cause by addressing foreseeability and whether the defendant may be held legally responsible for his or her conduct. In addition to considering the governmental actor's conduct, it must also be decided whether there are other proximate causes of the injury. . . .

> Once the various proximate causes have been determined, the question then becomes whether taking all possible proximate causes into account, the government actor's gross negligence was *the* proximate cause of injury. This requires considering defendant's actions alongside any potential proximate causes to determine whether defendant's actions were, or could have been, the one most immediate, efficient, and direct cause of the injuries. The relevant inquiry is not whether the defendant's conduct was the immediate factual cause of injury, but whether, weighing the legal responsibilities of the actors involved, the government actor could be considered the proximate cause.

*Ray II*, 321 Mich. App. at 759-760 (quotation marks and citations omitted).

In *Ray*, a 13-year-old student athlete was struck and injured by an automobile while he practiced running with his cross-country team. *Ray II*, 321 Mich. App. at 758-759. Although eyewitness accounts varied, there was evidence that the plaintiff's coach urged him into the road despite a "red hand" on the pedestrian traffic signal. *Id.* at 759. The coach asserted governmental immunity, claiming that he was not *the* proximate cause of the injury because the student's own action of running into the road and the fact the automobile struck him were more immediate and direct causes of his injury. *Id.* The court initially agreed, but the Michigan Supreme Court used the opportunity, as discussed above, to sharpen the legal distinction between cause-in-fact and proximate cause. *Id.* On remand, the Michigan Court of Appeals concluded that there were "myriad variables affecting the actors' respective negligence and legal responsibility" that prevented any assessment or weighing of the individual actors' competing legal responsibilities. *Id.* at 762. Because the coach's actions could have been *the* proximate cause, the court held that summary disposition on the basis of governmental immunity was inappropriate. *Id.*; *see Collins v. Kofahl*, 2019 WL 1304964, at *5 (Mich. Ct. App. Mar. 21, 2019).

Here, there is a question of material fact as to whether the defendants were the proximate cause of Bennett's injury.  Applying the first part of the *Ray*

framework, assuming gross negligence, it appears that the defendants were a cause in fact of Bennett's injuries.  If McLean and/or Winn moved him out of the cell with Beal, Beal would not have attacked him.  Beal had told plaintiff that he wanted him out of the cell or he, plaintiff, would face the consequences.  Thus, if plaintiff was moved, it would seem Beal would not have attacked him or have reason to attack him.  And, Florey and Wright do not contest plaintiff's assertion that one of the two was supposed to be standing in the walkway where the attack occurred, and the other standing at the entrance.  Plaintiff believes, and it is reasonable to infer, that had the two guards been standing in the walkway and entrance, Beal would not have had an opportunity to attack plaintiff.  Hence, it appears that the defendants were a cause in fact of plaintiff's injury.

On these facts, and drawing reasonable inferences in plaintiff's favor, the defendants' actions could have been *the* proximate cause of plaintiff's injury under the second part of the framework.  Like in *Ray*, *supra*, there are multiple variables affecting the determination of respective negligence.  We have the defendants' actions, discussed above.  Of course, Beal is an important actor in plaintiff's injury as well.  Perhaps plaintiff had some part in this in allowing himself to walk closely to the inmates, and Beal, ahead of him in the walkway.  The undersigned cannot conclude, on this record, that the defendants were not *the* proximate cause of plaintiff's injury, and thus the undersigned suggests that summary judgment not be

granted on the gross negligence claim. *See Collins*, 2019 WL 1304964, at *6 ("As in *Ray II*, there are diverging factual issues that might affect the determination of which proximate cause out of several competing options constitutes "the one most immediate, efficient, and direct cause" of Collins's injuries." Accordingly, the court upheld the lower court's denial of the defendant's motion for summary disposition.).

### 3. First Amendment Retaliation

Retaliation, although not expressly referred to in the Constitution, is actionable based on the premise that retaliatory actions may tend to chill an individual's exercise of First Amendment rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). To state a *prima facie* case for retaliation prohibited by the First Amendment, Bennett must establish the following: 1) he engaged in protected conduct, 2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct, and 3) that a causal connection exists between the first two elements. *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

### a. Defendant McLean

Plaintiff brought a retaliation claim against McLean alleging that McLean threatened to transfer him to another facility far away from his family if he complained to prison administration officials about McLean or his unit officers.

(ECF No. 1, PageID.41). Prior to the December 2013 assault by inmate Meredith, plaintiff approached corrections officer Norman asking to be moved because he felt threatened. (ECF No. 1, PageID.9). Because Norman did not take any action, plaintiff then went to defendant Winn, the deputy warden at SRF. He explained to Winn that Norman ignored his request to move and made derogatory comments in front of other officers and inmates, accusing him of snitching on Meredith. (ECF No. 1, PageID.10).

On January 6, 2014, when Bennett met in person (according to Bennett) with McLean regarding the situation with Beal, McLean brought up Bennett having gone behind Norman to Winn about the issue. Bennett says McLean told him "Let me find out that you went behind my back to the warden about any of my officers . . . you can forget about staying close to home. I will transfer your ass to Ionia or across that bridge." (ECF No. 65, PageID.1274, ¶ 37).

Later that day, January 6th, Bennett sent a letter to Winn requesting a move. (*Id.* at PageID.1275, ¶ 41). On January 8th, McLean called Bennett to his office. According to Bennett, he said, "Didn't I tell you not to go behind my back to the administration regarding anything that goes on i[n] this unit?" (*Id.* at ¶ 43). McLean then said Bennett would be moved to a facility out west or up north. (*Id.* at ¶ 44).

On February 5, 2014, McLean initiated the transfer process by preparing a "transfer screen" on plaintiff three days after Bennett's sister last called to inquire about the assault. (*Id.* at PageID.1277, ¶ 50; ECF No. 65, PageID.1408-09). The transfer order indicates that Bennett was transferred because he was found guilty of possession of a weapon. (ECF No. 65, PageID.1409). On February 13, 2014, Bennett was transferred to the correctional facility in Ionia, Michigan, one of the locations McLean threatened to send him. (*Id.* at PageID.1277-78, ¶ 52).

McLean does not recall having any conversations with Bennett or ever speaking with Officer Norman about Bennett. McLean says he has never told a prisoner about any conversations he has with another staff member about the prisoner. (ECF No. 37-2, PageID.532, ¶ 5, 6). According to McLean, he never told a prisoner that he would send them across the bridge or to Ionia. He does not control where a prisoner is transferred; the Transfer Coordinator determines that. (ECF No. 37-2, PageID.533, ¶ 7).

McLean argues that plaintiff has not alleged that he engaged in protected conduct. McLean contends that a threat to transfer or a transfer to another facility does not amount to adverse action. (ECF No. 37, PageID.523-24).

Plaintiff disagrees. He says that the letter to Winn constitutes protected conduct. Plaintiff contends that McLean engaged in adverse action when on January 8, 2014, McLean called plaintiff out and loudly said, "Didn't I tell you not

to go behind my back to the administration regarding anything that goes on in this unit?" (ECF No. 65, PageID.1255).  He then retrieved plaintiff's prison file and stated that he was going to be moved up north. Plaintiff acknowledges that transfers to the general population of another prison are not typically adverse actions, but he asserts that his transfer would result in foreseeable negative consequences that constitute adverse action.  Namely, that he would be further away from his family and elderly mother.  (*Id.* at PageID.1256).  On February 13, 2014, plaintiff was transferred to another facility further away.

Even if McLean had control over plaintiff's transfer, which he disputes (ECF No. 37-, PageID.533, ¶ 8), and told plaintiff he would be transferred after finding out plaintiff went to the administration, plaintiff's retaliation claim cannot be sustained based on his transfer.  As the Sixth Circuit has observed, "[S]ince transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 701–02 (6th Cir. 2005) (citing *Smith v. Yarrow,* 78 Fed. Appx. 529, 543–44 (6th Cir. 2003)).  On the other hand, where there are aggravating factors, courts have been willing to find that a prison transfer would deter a person of ordinary firmness.  *Id.* at 704.  For example, in *Siggers-El*, the aggravating factors accompanying the transfer included the loss of a high paying job needed to pay for the plaintiff's attorney (representing him in a direct

appeal of his criminal conviction), and increased difficulties for the plaintiff's attorney in visiting with or representing the plaintiff because he was moved further away from her. *Id*. This limited exception applies "where there are foreseeable consequences to the transfer that would inhibit the prisoner's ability to access the courts." *Hix v. Tenn. Dept. of Corrections*, 196 Fed. Appx. 350, 358 (6th Cir. 2006) (citing *Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir. 2005)). Where a prisoner alleges no such foreseeable consequences, however, the claim of retaliatory transfer must fail. *Id*. A threat to transfer the prisoner to a more restrictive living environment with fewer privileges could constitute adverse action that would deter a person of ordinary firmness from exercising a constitutional right. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398-399 (6th Cir. 1999) (adverse action found where prisoner alleged harassment, physical threats and a transfer to an area of the prison with squalid living conditions and populated with mentally-ill prisoners); *Hill v. Lappin*, 630 F.3d 468 (6th Cir. 2010) (prisoner's allegation of prison staff's threat and recommendation to transfer him to the lock-down unit at another facility constituted adverse action sufficient to defeat motion for dismissal); *King v. Zamiara*, 150 Fed. Appx. 485, 494 (6th Cir. 2005) ("Increasing [a prisoner's] custody security level was an adverse action because the result of more restrictions and fewer privileges could deter a person of ordinary firmness from engaging in protected conduct.).

Here, plaintiff does not allege or argue such foreseeable consequences, and does not claim that his transfer to (or threat to transfer to) a new facility resulted in a more restrictive living environment.  There is also no allegation or evidence that his transfer caused any limitation in his access to the courts.  The foreseeable consequence plaintiff claims is that he would be further away from his family and elderly mother.  This is insufficient to constitute a violation of the First Amendment.  For example, in *Maben v. Shaheen*, 2018 WL 3298076 (E.D. Mich. Jan. 31, 2018), the plaintiff argued that his transfer "amounted to adverse action because he suffered the loss of trusted friends, lost sleep and experienced fear and anxiety after being moved to a new open-cube environment."  *Id.* at *5.  Based on the law cited above, the Court concluded that these consequences did not rise to the level of adverse action sufficient to constitute a constitutional violation.  In another case wherein the plaintiff claimed more negative consequences from a transfer than Bennett does here, the court found no adverse action.  In *Henly v. Miller*, 2013 WL 1305285 (W.D. Mich. Mar. 6, 2013), the plaintiff claimed that due to his transfer he suffered damages including; (1) living arrangements that interfered with his ability to study and sleep; (2) the possibility that he may go years without a job; (3) loss of wages affecting his ability to pay an attorney and to call family; and (4) that he was routinely hungry and anxiety-ridden. *Id.* at *6. The court held that these negative consequences are not the sort that would prevent the plaintiff from

engaging in protected conduct. *Id.* at \*7. The court further stated that if it construed the changes in his living conditions listed above as sufficient to support a cause of action for retaliatory transfer, "then virtually every unwanted prison transfer could be contested on this basis. In short, the *Siggers–El* exception allowing retaliatory transfer actions in exceptional cases would swallow the general rule prohibiting such actions." *Id.*

The undersigned concludes that the threat to transfer plaintiff, and then transferring him, do not constitute adverse action. McLean is entitled to summary judgment on the First Amendment retaliation claim.

### b.      Defendants Winn and Deshias

The following facts pertain to plaintiff's retaliation claim against defendants Deshias and Winn. On January 16, 2014, plaintiff called his sister from the inmate phones at SRF. He told her about the stabbing and that he told McLean and Winn of the threats and requests to move, but neither defendant moved him. (ECF No. 65, PageID.1286, ¶ 81). He also told her he was going to call his criminal appellate attorney, Brett DeGroff, about filing a civil lawsuit against MDOC staff. (*Id.*). The next day, he called attorney DeGroff and left a voice message informing him that he had been stabbed. He also said he needed legal advice about filing a civil lawsuit because he informed Winn and McLean about threats made prior to the stabbing, but they refused to take action. (*Id.* at ¶ 82).

The following day, January 18th, Deshias conducted a shakedown of plaintiff's cell. (*Id.* at ¶ 82). During a frisk search of plaintiff, plaintiff says Deshias told him, "So you're the jailhouse lawyer trying to sue Winn, huh?" After searching the cell, plaintiff heard him say, "We got him!" (*Id.* at PageID.1287, ¶ 83-84). Deshias produced a shank, a tattoo needle, and a razor blade he said he found in plaintiff's locker. (*Id.* at ¶ 85).

Bennett does not dispute that the razorblade is his, but insists the needle and shank are not his. (*Id.* at PageID.1288, ¶ 90). Despite what the misconduct hearing officer wrote in the report, he says he told the officials at the hearing that he thought that, besides his cell mate, Deshias could have planted the contraband. (*Id.* at PageID.1288, ¶ 92). He thinks Deshias fabricated the finding to retaliate against him for planning to sue prison officials. Winn has the authority to monitor and record any non-attorney outgoing calls from SRF inmate phones. (*Id.* at PageID.1291, ¶ 101). Plaintiff says Winn admitted to knowing Deshias. (*Id.* at PageID.1290, ¶ 97). According to Bennett, since Deshias made clear he knew about the lawsuit, he must have learned about it from Winn. (*Id.* at PageID.1291, ¶ 102). He believes Winn and Deshias conspired together to plant the contraband. Bennett confronted Winn about his suspicion on February 6, 2014, but Winn only responded by calling him a "wise-ass troublemaker," a phrase other prison staff used to refer to plaintiff. (*Id.* at PageID.1290-91, ¶ 100).

For his part, Winn does not recall having a conversation with Bennett about McLean.  He does not recall having a conversation with Bennett where Bennett accused him and Deshias of conspiring to plant weapons and contraband in Bennett's cell.  (ECF No. 37-3, PageID.536, ¶ 7).  He says he has never conspired to have a weapon or other contraband planted on a prisoner or in a prisoner's cell.  Deshias does not contest the allegations.

### i.      Defendant Winn

In his complaint, Bennett included a laundry list of actions by Winn that he claims were done in retaliation for protected conduct.  These include: a verbal threat to bring charges against him, arbitrarily placing him on modified grievance restriction, transferring him to another facility, and conspiring with Deshias to plant illegal contraband weapons in his cell because he contacted his family and his attorney about bringing a civil lawsuit.  (ECF No. 1, PageID.41-42, ¶ 235).  Winn argues that the complaint allegations fail to state what charges Winn threatened to bring or when the threat occurred.  (ECF No. 37, PageID.524).  He also argues that placing plaintiff on grievance restriction and transferring plaintiff to another facility does not constitute adverse action.  (*Id.* at PageID.525).  The remainder of Winn's argument is on the claim about conspiring with Deshias to plant contraband.  Plaintiff limits his response to the contraband issue; he does not address his complaint allegations about being threatened with a charge, being

placed on grievance restriction, and Winn transferring him. (ECF No. 65, PageID.1257-61). The undersigned concludes, then, that plaintiff has abandoned these claims against Winn and is pursuing only the retaliation claim about the contraband.

Winn does not dispute that contacting an attorney about filing a lawsuit is protected conduct. He also does not dispute that, if it were true that Winn was involved with planting contraband on plaintiff, that would be an adverse action. (ECF No. 37, PageID.524). However, Winn argues that this claim is too conclusory and cannot stand because plaintiff admitted to owning the razorblade and alleged at the misconduct hearing that the shank belonged to his cell mate, not that it was planted by a prison official. (*Id.* at PageID.525).

In the view of the undersigned, the claim against Winn is too speculative to find in plaintiff's favor. The only evidence supporting plaintiff's conspiracy assertion are his sworn statements that Winn knows Deshias and the claim that Winn has access to inmate phone calls (but plaintiff does not aver that *only* Winn had access to inmate phone calls). Winn does not dispute these factual assertions. However, that a supervisory official, indeed the deputy warden of the prison, knows the corrections officers in the prison does not mean that Winn spoke to a particular officer and conspired with him to plant contraband. And, although Winn had access to plaintiff's phone calls, and even if one assumed Winn listened to the

38

phone call with the attorney, this does not mean that Winn then went to Deshias to plan to plant contraband because Bennett talked to his attorney about filing a lawsuit.  Plaintiff does not have personal knowledge that Winn listened to his phone calls or that Winn spoke to Deshias about the contraband.  His theory that Winn did so is purely speculative and without basis in evidence.

The Sixth Circuit has previously rejected the proposition that speculation can substitute for evidence, explaining, "[t]o survive a summary judgment motion, a plaintiff must put forward more than speculations or intuitions." *Frazier v. USF Holland, Inc.*, 250 Fed. Appx. 142, 148 (6th Cir. 2007) (citing *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) (holding that plaintiff failed to establish knowledge on the part of the decisionmaker where plaintiff did not produce any evidence, direct or circumstantial, to rebut evidence that decisionmaker had no knowledge and plaintiff offered "only conspiratorial theories, not the specific facts required under the Federal Rule of Civil Procedure 56").  Rule 56(e) requires that material submitted in support of, or in opposition to, motions for summary judgment include facts based on personal knowledge, and that personal knowledge "must be evident from the affidavit." *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F. Supp. 2d 948, 956 (S.D. Ohio 2000).

No reasonable jury could conclude, on this evidence alone, that Winn conspired with Deshias to plant contraband in plaintiff's cell in retaliation for

discussing a lawsuit with his attorney.  Plaintiff avers that Deshias mentioned the lawsuit to him the day after he spoke to his attorney about filing a lawsuit.  Deshias does not dispute that he made such a statement to plaintiff.  It is not clear how Deshias came across information regarding the potential lawsuit, but to conclude that he got the information from Winn would not be a reasonable inference.  The claim is too speculative.  Thus, no reasonable jury could conclude that Winn engaged in adverse action against plaintiff.

The undersigned finds an additional reason why no reasonable jury could credit plaintiff's averments that Winn conspired with Deshias.  The undersigned is aware that juries, not judges, determine the credibility of witnesses. *See Dawson v. Dorman*, 528 Fed. Appx. 450, 452 (6th Cir. 2013). But it is equally true that when a party moves for summary judgment, the judge's job is to decide whether there is a genuine dispute for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"); *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986) ("[T]here must be evidence on which the jury could reasonably find for the plaintiff.").

On February 13, 2014, plaintiff submitted a grievance form complaining of the stabbing incident (discussed above) and asserting that Deshias planted the contraband he "found" in plaintiff's cell.  (ECF No. 65, PageID.1414-18).  He

wrote that on February 6th, a week before filing the grievance, Winn was making

rounds in administrative segregation where plaintiff was housed at the time.

Plaintiff says that he asked Winn "several questions regarding the January 10, 2014

[assault] incident," but Winn refused to answer any questions about the attack.

(*Id.*).

However, in the declaration in support of his response, plaintiff avers that on

the 6th, in administrative segregation, he also asked Winn if he knew Deshias;

Winn responded in the affirmative.  Plaintiff says he asked about Winn's

"association" with Deshias "because on January 18, 2014, while being 'pat-down'

in front of cell #06, I asked Defendant Deshias, 'What's going on, officer?'

Deshias [sic] response was, "So you're the jailhouse lawyer trying to sue Winn,

huh?'"  (ECF No. 65, PageID.1290).  Yet, this additional information regarding the

conversation with Winn, and the allegation that Winn conspired to plant

contraband, did not come up in the grievance filed less than a month after the

contraband incident.  The allegation against Winn does not appear until plaintiff

filed this case on July 10, 2017, over three years after he alleges that Winn

conspired with Deshias to do so.

Plaintiff offers no reason for giving an account of what transpired with

Deshias in his grievance, but not mentioning Winn's involvement with the

contraband even though he allegedly had already had the conversation with Winn

41

in segregation before filing the grievance.  The allegations against Winn are such that no reasonable jury could find them to be truthful.

### ii.    Defendant Deshias

As for Deshias, he contends that plaintiff's claim that he planted contraband in his cell is conclusory and refuted by the misconduct report.  In the report, it was recorded that plaintiff admitted to owning the razor but alleged that the shank was his cell mate's.  (ECF No. 37, PageID.526).  Like Winn, he does not dispute that contacting an attorney about a lawsuit is protected conduct, and does not challenge that planting contraband would constitute adverse action.

Unlike Winn's case, the undersigned disagrees with Deshias that plaintiff's contraband claim is too conclusory.  While it is true that the misconduct report recorded that plaintiff blamed his cell mate for the shank, plaintiff has rebutted this evidence with his declaration in which he states he also said, at the misconduct hearing, that it could have been planted there by Deshias.  (ECF No. 65, PageID.1288, ¶ 92).  This additional statement, for some reason, did not make it into the written report.

Plaintiff has created a question of material fact on this retaliation claim.  He has brought forth evidence suggesting that Deshias became aware—somehow— that he was planning to file a lawsuit against Winn about the failure to protect him from the attack.  He also avers that he did not have or own the shank or tattoo

needle, but once Deshias gained access to plaintiff's cell, Deshias came upon these objects. Based on this evidence, it is reasonable to infer that Deshias planted the contraband; and, Deshias did not submit evidence to the contrary (for example, by way of affidavit disputing that he planted the evidence). It is not plaintiff's burden to prove that Deshias in fact planted contraband in his cell; rather, he meets his burden by creating a question of fact on the issue. This he has done. *See, e.g.*, *Arrington v. Wickstrom*, 2012 WL 1029957 (W.D. Mich. Mar. 27, 2012) (The plaintiff alleged that the defendant retaliated against him by planting contraband in his cell and threatened that filing lawsuits would cause more pain. The plaintiff also presented evidence that the defendant's shake-down of the cell was unusual. The court concluded that was sufficient to permit a jury to find that the defendant planted the contraband.). Accordingly, there is a question of material fact as to whether Deshias engaged in adverse action against plaintiff.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendants McLean, Winn, Florey, and Wright's motion for summary judgment (ECF No. 36) be **GRANTED IN PART, DENIED IN PART**. Specifically, the undersigned recommends that summary judgment be granted to defendants McLean and Winn on the First Amendment retaliation claim, but that summary judgment be denied on all the remaining claims.

43

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  February 18, 2020                    s/Michael J. Hluchaniuk
                                            Michael J. Hluchaniuk
                                            United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I certify that on February 18, 2020, I electronically field the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record and that I have mailed by United States Postal Service to the following non-ECF participant: John Eric Bennett, #218736, Central Michigan Correctional Facility, 320 N. Hubbard, St. Louis, MI  48880.

s/ Durene Worth
Case Manager
(810) 341-7881
durene_worth@mied.uscourts.gov